628 P.2d 939

**STATE of Arizona, Appellee,**

v.

**Michael Andrew RHYMES, Appellant.**

No. 5051.

Supreme Court of Arizona,
In Banc.

April 28, 1981.
Rehearing Denied June 2, 1981.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Barbara A. Jarrett, Asst. Attys. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by James R. Hart, II, Phoenix, for appellant.

HOLOHAN, Vice Chief Justice.

The defendant, Michael Andrew Rhymes, was tried and convicted of first degree murder. He was sentenced to life imprisonment. A timely appeal was filed. By virtue of the sentence imposed, we have jurisdiction. A.R.S. § 13-4031.

The evidence at trial reflects that the defendant was a member of a group led by "Doc" Rider, and the group had been involved in various criminal activities. Rider had become concerned about the loyalty of one of the members of the group, Irvin Carl Ludwig, so Rider ordered the defendant and Charles Bush to take Ludwig into the desert and kill him. The defendant and Bush carried out the order and did in fact kill Ludwig.

The defendant has raised four issues in this appeal:

1. Did the trial court err in holding that defendant's statement regarding the Ludwig killing was voluntarily made?

2. Was the defendant entitled to a jury instruction regarding manslaughter?

3. Did the trial court properly instruct the jury as to the definitions of first and second degree murder?

4. Did the prosecution properly establish the identity of the victim?

## I

### The Defendant's Statement

On January 11, 1980, the defendant, while in custody, gave a statement to law enforcement officers in which he admitted helping Charles Bush kill the victim Ludwig. Prior to trial the defendant moved to dismiss the murder charge against him or to suppress the confession given on January 11. The defendant claims that he was granted immunity from prosecution of the offense by the Maricopa County Attorney's Office.

After an evidentiary hearing the trial court denied the motion to dismiss, denied the motion to suppress, and ruled that the defendant's confession was voluntary. The defendant challenges those rulings.

The defendant has the burden of proving by a preponderance of evidence the existence and terms of an agreement to grant immunity. *State v. Burr*, 126 Ariz. 338, 615 P.2d 635 (1980). The state does not contest the fact that the defendant was granted immunity for certain crimes in November 1979, in return for information supplied by the defendant concerning the activities of the Rider gang. The state does contend, however, that the present murder charge was never included within the terms of the agreement.

The defendant urges that even if there is not sufficient proof in the record to support a dismissal of the charge, the defendant's statement should not have been considered voluntary. The state has the burden of showing by a preponderance of evidence that a confession was made voluntarily and without any direct or implied promises. *State v. Burr, supra.*

A resolution of these matters requires a review of the evidence. It must be noted, however, that the trial court has the duty to resolve any conflicts in the evidence, and this court will uphold the findings of the trial court on the voluntary nature of a confession if the findings are supported by adequate evidence in the rec-

ord. *State v. Jerousek*, 121 Ariz. 420, 590 P.2d 1366 (1979).

■ The evidence presented shows that in November 1979, the Maricopa County Sheriff's Office was investigating the circumstances surrounding the death of a John Brown. Sheriff's investigators discovered that the defendant was a friend of the deceased Brown, but they also discovered that the defendant was in custody on a felony charge. Although the defendant was never a suspect in the Brown homicide, the deputies investigating the case soon found that the defendant was part of a group involved in criminal activities in both Arizona and California. With this background the investigators and deputy county attorney determined that an offer of immunity should be made to the defendant through his attorney in return for the defendant furnishing information about the activities of the Rider gang in Arizona and California. The defendant, in giving his information, would be given immunity from prosecution for extortion and conspiracy charges which might arise out of incidents done at the direction or request of Rider.

The prosecutor had the agreement made a part of a taped interview with the defendant and his counsel. The prosecutor also made a special point to explain the limitation of the immunity by stating:

Deputy County Attorney Jones:

"I want to make perfectly clear to you that our [immunity] agreement in no way bars any kind of prosecution on any other kind of crime. *For example, there is a possibility that there is another murder involved here.* That's been thrown about. I have no specific information about it. *But we are not making any agreement regarding any murder* or any other crime. Only the crimes I just talked to you about. And I just laid those out. I am just trying to make sure you understand what we are including and what we are excluding. Okay. Do you understand? Defendant: Yes, I do."

(Emphasis supplied).

The defendant testified that he did not remember the above stated limitation on the immunity agreement, but he does not deny that the statement was in fact made. The defendant asserts that he felt that he had immunity for anything pertaining to the activities of Rider.

It is noteworthy that in the information given by the defendant to the investigators in November 1979, he never made any reference to the killing of Ludwig which had occurred in September 1979. In fact, the defendant did not mention the existence of Irvin Carl Ludwig as a person connected with the Rider group.

After the arrest and questioning of Bush in January 1980, the deputies first learned that the defendant had taken part in the murder of Ludwig. The defendant was taken into custody, advised of his rights, and the January 11th statement was taken. Prior to taking the January 11th statement, the officers advised the defendant that no promises or deals were being made in return for the statement.

Essentially, the defendant's position is that he thought he still had immunity from prosecution at the time he gave the January 11th confession, and he felt that the prosecutor's grant of immunity was applicable to the Ludwig homicide notwithstanding the warning by the officers that no deal could be made. The trial court did not accept the position of the defendant. A review of the evidence, which includes the fact that the prosecutor specifically excluded any homicide from the grant of immunity and the fact that the defendant never mentioned the Ludwig killing in the information furnished to law enforcement officers, shows that there was substantial evidence to support the conclusions of the trial court. There was no error in admitting the confession into evidence.

## II

*Refusal Of A Manslaughter Instruction*

At trial, the defendant testified about the circumstances of the killing of Ludwig, which testimony was completely at variance

with his January 11th statements and the testimony of Bush. The defendant testified at trial that he only found out about the murder plan after he and Bush had taken the victim into the desert. He maintained that his participation in the killing was exacted at the threat of his life and was limited to merely distracting the victim so that Bush could approach him from behind. The defendant sought to have the trial court instruct the jury on a theory of manslaughter. The request was rejected.

Defendant argues that his conduct amounted to manslaughter because it was coerced by the threat of death. The relevant statute reads:

"§ 13–1103. Manslaughter; classification

A. A person commits manslaughter by:

. . . . .

4. Committing second degree murder *as defined in § 13–1104, subsection A, paragraph 3*, while being coerced to do so by the use or threatened immediate use of unlawful deadly physical force . . . ."

(Emphasis supplied).

■ The critical point is that coercion reduces a killing to manslaughter *only* when the defendant commits second degree murder pursuant to A.R.S. § 13–1104(A)(3). This statutory subsection prohibits recklessly engaging in conduct "which creates a grave risk of death and thereby causes the death of another." Thus, coercion can only act to reduce a *reckless* killing to manslaughter. It has no application to an intentional killing, such as is defined in A.R.S. § 13–1104(A)(1).

■ In the present case, the defendant's own testimony was that he was aware that once he got out to the desert that Ludwig was to be killed by Bush. This establishes that the killing was intentional, and the defendant's claim of coercion did not entitle him to an instruction on manslaughter under such circumstances.

### III

*Sufficiency Of The Murder Instructions*

Defendant argues that the instructions on first and second degree murder were erroneous in that they failed to apprise the jury of the element of intent. First degree murder is defined as follows: "Intending or knowing that his conduct will cause death, such person causes the death of another with premeditation." A.R.S. § 13–1105(A)(1).

Defendant complains that the trial court's first degree murder instruction did not contain the element of intent. We do not agree. The trial court's instruction stated:

"A person commits murder first degree if he causes the death of another person, and he knew that his conduct would cause death, and he acts with premeditation. Premeditation means decided beforehand. That exists where the person acts with *either the objective in mind to kill another person or the knowledge that he would kill another person when such intention or knowledge* foresees the killing by a length of time sufficient to permit reflection."

(Emphasis supplied).

■ The trial court's instruction described the culpable mental state of "intent" in layman's terms when it referred to having "the objective in mind to kill another person." *See* A.R.S. § 13–105(5)(a). Moreover, it even labeled this description as "intent" in the same sentence. Accepting *arguendo* the defendant's contention that "intent" is a necessary part of the first degree murder instruction, we think it is clear that the trial court included this element in its instruction. Where an instruction substantially covers the points requested by defendant, there is no need for the court to give defendant's exact form of that instruction. *State v. Kelley*, 110 Ariz. 196, 197–98, 516 P.2d 569, 570–71 (1973).

■ The defendant also complains that the trial court gave an insufficient definition of second degree murder in its instruction on that subject. Although a second degree murder instruction was given to the jury, the facts did not support the use of

such an instruction. Second degree murder is distinguished from first degree murder by the fact that there is no element of premeditation required. *Compare* A.R.S. §§ 13–1104 *with* 13–1105. Yet the instant case presents no facts which would warrant a jury in concluding that defendant was guilty of an unpremeditated second degree murder. Accepting as true the testimony of the defendant at trial, the killing was clearly premeditated on the part of Bush. If the jury believed defendant's story as to his lack of participation, then he was entitled to an acquittal. If, on the other hand, the jury concluded that defendant acted as an accomplice to Bush, he was liable under A.R.S. § 13–303(A)(3) for the substantive crime committed by Bush, which was first degree murder. In no event was the defendant entitled to an instruction on unpremeditated second degree murder. Therefore, any error in the instruction was harmless. A.R.S. § 13–3987.

IV

### Identification Of The Victim

 Defendant argues that the state failed to carry its burden of identifying the victim. In a murder case, the state must prove that the victim named in the indictment is actually dead. *State v. Thorp*, 70 Ariz. 80, 82–83, 216 P.2d 415, 417 (1950).

In the present case, the prosecution used fingerprint evidence and the testimony of Bush to establish the victim's identity. The testimony at trial established that fingerprints taken from the body matched those on a prior fingerprint card filed with the Maricopa County Sheriff's Office under the name of Carl Ludwig. The defendant urges that this card was introduced into evidence without sufficient authentication.

The state presented George Barta, an evidence technician employed by the sheriff's office, who testified that he brought Ludwig's fingerprint card from the master file of the sheriff's office, which files are maintained by that office as part of their official records. Barta also testified as to the process by which fingerprints are entered and

updated in the files. The fingerprint card was admitted into evidence. The testimony established the origin and contents of the fingerprint card, and it was properly admitted as an official record. Rule 901(b)(7), Arizona Rules of Evidence.

In addition to the issues raised in the briefs, we have searched the record for fundamental error and, finding none, the judgment of conviction and sentence are affirmed.

STRUCKMEYER, C. J., and HAYS, CAMERON and GORDON, JJ., concur.